NOTICE: This opinion is subject to motions for reargument under V.R.A.P. 40 as well as formal revision before publication in the Vermont Reports. Readers are requested to notify the Reporter of Decisions by email at: JUD.Reporter@vermont.gov or by mail at: Vermont Supreme Court, 109 State Street, Montpelier, Vermont 05609-0801, of any errors in order that corrections may be made before this opinion goes to press.

2019 VT 57

No. 2018-232

| | |
|---|---|
| In re Diverging Diamond Interchange SW Permit, Diverging Diamond Interchange A250 (R.L. Vallee, Inc. and Timberlake Associates, LLP, Appellants) | Supreme Court |
| | On Appeal from Superior Court, Environmental Division |
| | April Term, 2019 |

Thomas G. Walsh, J.

Jon T. Anderson of Primmer Piper Eggleston & Cramer, and Alexander J. LaRosa of MSK Attorneys, Burlington, for Appellant R.L. Vallee, Inc.

David L. Grayck of Law Office of David L. Grayck, Montpelier, for Appellant Timberlake Associates, LLP.

Thomas J. Donovan, Jr., Attorney General, and Justin Kolber and Jenny E. Ronis, Assistant Attorneys General, Montpelier, for Appellees State of Vermont, Agency of Transportation, Agency of Natural Resources and Natural Resources Board.

PRESENT: Reiber, C.J., Skoglund, Robinson, Eaton and Carroll, JJ.

¶ 1. **SKOGLUND, J.** Plaintiffs R.L. Vallee, Inc. (Vallee) and Timberlake Associates, LLP (Timberlake) appeal various aspects of three decisions that culminated in the environmental division granting the Vermont Agency of Transportation (VTrans) Act 250 and stormwater discharge permits for a highway project involving the reconfiguration of an interstate exit.[1] We conclude that the environmental division erred in dismissing Vallee's questions regarding

---

[1] Vallee leases land and runs a commercial business near the proposed project. Timberlake owns land and runs a commercial business near the proposed project.

Criterion 1 of Act 250; in all other respects, we reject Vallee's claims of error. Accordingly, we uphold issuance of the stormwater permit, reverse issuance of the Act 250 permit, and remand the matter for the environmental division to consider Vallee's questions concerning Criterion 1.

¶ 2. The subject project involves constructing a diverging diamond interchange[2] at Exit 16 of I-89 in Colchester and making related improvements to U.S. Route 2/7 in the immediate vicinity of Exit 16. The project is in the Sunnyside Brook watershed and requires an individual stormwater permit. VTrans initially filed a stormwater permit application with the Agency of Natural Resources (ANR) in February 2013 and then filed revised applications in October 2014 and January 2015. Further revisions to the application were made in March 2015, June 2015, and October 2015. In May 2016, ANR approved the stormwater permit application. Vallee appealed to the environmental division.

¶ 3. In November 2013, VTrans applied for an amended Act 250 permit based on its assumption that the project would involve only 9.82 acres of land, which would not trigger Act 250's ten-acre jurisdictional threshold for requiring a new permit. By April 2014, revisions to the project's footprint increased the affected acreage to just over ten acres, causing VTrans to revise its application to request a separate Act 250 permit for the project. In early June 2014, upon request by the District #4 Environmental Commission, VTrans provided a revised adjacent-landowners list. The Commission granted VTrans an Act 250 permit and permit amendments in November 2016. Both Vallee and Timberlake appealed to the environmental division for de novo review of the permit applications.

¶ 4. In a March 2017 decision concerning VTrans's Act 250 permit application, the environmental division denied Vallee party status as a landowner, see 10 V.S.A. § 6085(c)(1)(B), but granted Vallee party status as having a "particularized interest" under Act 250 that might be

---

[2] A diverging diamond interchange is a freeway interchange pattern in which the arterial highway crosses to the left side of the road under the freeway to eliminate left turns across traffic.

2

affected by a decision on the permit request, see id. § 6085(c)(1)(E). With regard to Act 250's Criterion 1, the court concluded that Vallee failed to show any potential impact to its groundwater but that its assertions were "sufficient to establish a reasonable possibility that Vallee's particularized interest in keeping its property free from pollution may be adversely affected by water pollution from the [Diverging Diamond Interchange] project." With regard to Act 250's Subcriterion 1(B), the court concluded that "Vallee has demonstrated a reasonable possibility that the . . . project was not designed in compliance with stormwater regulations, and that wastewater in the form of stormwater runoff may enter its property and affect its interest in keeping the property free from pollution."

¶ 5. Then, in three later decisions, the environmental division addressed both dockets, one concerning the stormwater discharge permit and the other concerning the Act 250 permit. In the first decision issued in October 2017, the court granted ANR's and VTrans's motions for summary judgment on thirteen of the sixteen amended questions Vallee raised with respect to the stormwater permit and denied ANR's and Vallee's cross-motions for summary judgment on three questions Vallee and Timberlake raised with respect to the Act 250 permit. Relevant to the instant appeal, the court determined that VTrans's stormwater application was administratively complete in October 2014 and therefore vested in the then-current laws and regulations, which at that time did not include chloride or phosphorus standards for waterways.

¶ 6. In the second decision issued in February 2018, the environmental division granted in part and denied in part ANR's and VTrans's motions to dismiss several of the Act 250 questions raised by Vallee and Timberlake. Relevant to this appeal, the court ruled that Vallee could not challenge chloride or phosphorus levels under Act 250's Criterion 1 concerning water pollution from stormwater runoff because water quality standards had not been adopted for those chemicals at the time VTrans submitted applications for Act 250 and stormwater permits.

3

¶ 7. In the third decision—the merits decision issued in June 2018 following a five-day evidentiary hearing involving the consolidated dockets—the environmental division granted VTrans's applications for Act 250 and stormwater permits. Relevant to this appeal, the court dismissed Vallee's party status with respect to Act 250's Subcriteria 1(B) and 1(E) for failure to demonstrate a particularized interest during the five-day trial[3]; nevertheless, the court addressed those criteria based on its treatment of Vallee as a friend of the court, see 10 V.S.A § 6085(c)(5), and the fact that Timberlake shared Vallee's position on the criteria. The court then went on to conclude that VTrans had satisfied both criteria. The court also ruled that Act 250's Criterion 5(A) and 5(B) did not apply to the subject project because VTrans's Act 250 application had already vested at the time those criteria were enacted.

¶ 8. On appeal to this Court, Vallee, joined by Timberlake,[4] argues that the environmental division erred: (1) in its February 2018 decision by dismissing Vallee's challenge to the Act 250 permit application under Criterion 1 based on its improper conflating of Criterions 1 and 1(B); (2) in its October 2017 decision by concluding as a matter of law that VTrans's stormwater application was complete in October 2014 and thus vested in regulations predating chloride and phosphorus standards; and (3) in its June 2018 decision by declining to address Act 250's Criterion 5(B) based on its determination that VTrans's Act 250 application vested before Criterion 5(B) was enacted.

---

[3] The court stated that it gave Vallee an opportunity to address its continued standing in a post-trial brief, but Vallee's only argument was that the plans for the project showed the road sloping towards Vallee's property, which supported the conclusion that stormwater runoff would flow onto the property. The court concluded that this was insufficient to show a particularized interest and noted that Vallee did not introduce any evidence identifying how the runoff would impact its property or how it might have a particularized interest different from the general public in the condition of Sunnyside Brook. The court pointed out that Vallee's sole focus at trial was on the alleged ineffectiveness of VTrans's proposed stormwater system.

[4] For the sake of simplicity, except as otherwise noted, we refer only to Vallee when citing arguments made by appellant Vallee and joined by appellant Timberlake. For the same reason, we refer to the State when citing arguments made by appellees VTrans and ANR.

4

## I. The Stormwater Discharge Permit

¶ 9. We first consider Vallee's argument, with respect to its challenge to the stormwater permit, that the environmental division erred in its October 2017 decision by granting VTrans summary judgment on Vallee's questions addressing chloride management. The environmental division ruled that VTrans's stormwater permit application was administratively complete and vested in then-current laws and regulations when VTrans submitted it on October 3, 2014. The significance of this ruling is that stormwater discharge permit applications are reviewed for compliance with the Vermont Water Quality Standards, which did not include any specific standards for chloride until October 30, 2014.

¶ 10. The environmental division made the following undisputed findings concerning VTrans's stormwater permit application. VTrans initially filed a stormwater permit application for the project on February 13, 2013. A couple of days later, ANR sent VTrans a letter stating that the application had been received and indicating that the letter did not serve as notice the application was complete. VTrans filed a revised application on October 3, 2014. That same day, an ANR employee informed other ANR personnel by email that the application had been received.[5] On October 16, 2014, the same ANR employee sent VTrans a letter stating that she had conducted her initial technical review of the application and that she was requesting additional information. The letter included requests to update application materials, provide additional information, and clarify parts of the application that were unclear.

¶ 11. On October 17, 2014, counsel for ANR sent an email to counsel for VTrans stating that an upcoming hearing on Act 250 Criterion 1(B) concerning waste disposal should be

---

[5] As discussed below, the court noted but did not rely on evidence of a screenshot of ANR records indicating that the application had been completed on October 6, 2014, as well as an ANR employee's affidavit stating that the employee had determined that the application was deemed complete on October 6, 2014 based on his review of the application materials and ensuing correspondence.

5

postponed because of the issues outlined in the October 16 letter. The email stated that ANR would ask VTrans to develop a chloride management plan. Counsel for VTrans agreed to postpone the Act 250 hearing. In a November 14, 2014 email, counsel for ANR told counsel for VTrans that providing the information sought in the October 16 letter "might not result in a final complete application because there may need to be further requests for information and revisions to the stormwater application after that."

¶ 12. On January 13, 2015, VTrans sent ANR a revised stormwater permit application that complied with the requests in ANR's October 16 letter. Among other things, the revised application listed landowners from whom land would be required for the project and included a chloride management plan as an appendix to the application. VTrans submitted further revisions to the application on March 4, June 15, and October 17 of 2015.

¶ 13. In February 2016, ANR provided public notice of a draft stormwater discharge permit for the project. On May 11, 2016, ANR approved the stormwater permit application and issued VTrans a permit.

¶ 14. On appeal to the environmental division, Vallee argued that VTrans's application did not vest until after October 30, 2014, when the new water quality standards that included chloride and phosphorus standards were in place. For their part, ANR and VTrans argued that the permit application vested when ANR deemed it administratively complete on October 6, 2014.

¶ 15. In addressing the parties' arguments, the environmental division first considered ANR's principles and practices concerning the review and vesting of stormwater applications. ANR reviews stormwater permit applications in two steps. First, it determines whether the application is administratively complete. When the application is considered administratively complete, ANR conducts a technical review of the application on its merits and decides whether it should be approved, denied, or modified. While acknowledging that ANR does not explicitly define administrative completeness, the court cited ANR's policies and guidelines in concluding

6

that a stormwater permit application is administratively complete when it includes all components normally required in an application such that ANR can review the technical merits of the application.

¶ 16. The environmental division found that, in this case, VTrans included in its October 3, 2014 application all of the elements required to review the application, as indicated on the notice-of-intent form submitted by VTrans along with the application. The court further found that the ANR employee reviewing the application indicated in an email that same day that she was going to conduct an initial review at her earliest convenience to determine whether the application was administratively complete. The court also noted an affidavit from another ANR employee who averred that he had reviewed the permit application materials and deemed the application complete on October 6, 2014. Further, the court cited an October 16, 2014 letter from the reviewing ANR employee indicating that she had begun her technical review of the application, which, according to the court, demonstrated that she must have deemed the application administratively complete before that date.

¶ 17. Based on these findings, the environmental division concluded that VTrans's application for a stormwater permit vested in the laws and regulations in place at the time the administratively complete application was filed on October 3, 2014. The court based its conclusion on this Court's determination that a permit applicant's rights vest in the laws that exist at the time a proper permit application was filed. See Smith v. Winhall Planning Comm'n, 140 Vt. 178, 181-82, 436 A.2d 760, 761 (1981) (adopting minority rule that subdivision permit applications vest "under the then existing regulations as of the time when proper application is filed"); In re B & M Realty, LLC, 2016 VT 114, ¶ 22, 203 Vt. 438, 158 A.3d 754 (applying minority rule). The court also considered that the water-quality-standard regulations in place at the time VTrans filed its administratively complete stormwater application: (1) defined an application as "any request for a permit . . . filed with, and deemed complete by, the reviewing

7

authority" and (2) stated that "the Water Quality Standards in effect at the time of the filing [of any application] shall apply." 2011 Vermont Water Quality Standards §§ 1-01A.2, 1-01B.4, Code of Vermont Rules 12 030 025; see In re Hannaford Bros. Co., No. WQ-01-01, slip op. at 9-11 (Vt. Water Res. Bd. June 29, 2001), https://anrweb.vt.gov/PubDocs/ DEC/Decisions/wrp/2001/wq-01-01-mod.pdf [https://perma.cc/5AQU-HRQV] ("For purposes of determining the vested rights of a permit applicant, the Board understands a complete application as follows: the application is such that the applicant would reasonably believe that the reviewing authority could act upon the application's merits."). Accordingly, the court determined that because VTrans's application was administratively complete on October 3, 2014 and vested in regulations without chloride standards, ANR and VTrans were entitled to summary judgment on Vallee's amended questions concerning chloride management.

¶ 18. On appeal, Vallee contends that the environmental division committed reversible error in granting ANR and VTrans summary judgment on the chloride management questions because there was a genuine issue of material fact as to when VTrans's operative stormwater application was complete. Vallee also argues that the minority approach for vesting of subdivision permit applications adopted in Smith is inconsistent with the federal Clean Water Act and does not make sense in the context of stormwater applications.

¶ 19. We review a decision on summary judgment "applying the same standard as the environmental court"; hence, we will uphold a decision granting summary judgment "if there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law." In re Champlain Oil Co., 2004 VT 44, ¶ 10, 176 Vt. 458, 852 A.2d 622 (quotation omitted); see V.R.C.P. 56(a) ("The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."). "In determining whether there is a genuine issue as to any material fact, we will accept as true the allegations made in opposition to the motion for summary judgment, so long as they are supported

8

by affidavits or other evidentiary material," and we give the nonmoving party "the benefit of all reasonable doubts and inferences." Robertson v. Mylan Labs., Inc., 2004 VT 15, ¶ 15, 176 Vt. 356, 848 A.2d 310. Nevertheless, the nonmoving party "cannot simply rely upon mere allegations in the pleadings to rebut credible documentary evidence or affidavits, but must respond with specific facts that would justify submitting [that party's] claims to a factfinder." Id. (citation omitted) (noting that opposing facts contained in affidavits must be based on personal knowledge and admissible in evidence).

¶ 20. According to Vallee, in granting ANR and VTrans summary judgment, the environmental division improperly drew inferences against Vallee as the nonmoving party.[6] In making this argument, Vallee cites three comments in the court's decision.

¶ 21. First, regarding the October 3, 2014 email in which the ANR employee indicated that the application was not yet administratively complete but that she would look at it at her earliest convenience, the court stated that the email "suggest[ed] that she was going to conduct an initial review of the application to determine if it was administratively complete." Vallee contends there was no evidence or testimony in the record concerning the employee's intent.

¶ 22. Second, regarding the October 16, 2014 letter in which the ANR employee indicated that she had begun her technical review of the application, the court stated that because applications must be administratively reviewed for completeness before any technical review, the application must have been administratively complete before October 16. Vallee argues that this

---

[6] Vallee also argues that the State conceded in its filings the existence of a factual dispute as to whether VTrans's stormwater permit application was completed before July 2015. We disagree. ANR argued that: (1) "to the extent" a factual dispute existed as to whether the application was completed on October 6, 2014, Vallee should be estopped from arguing the application was not complete until after July 2015; and (2) "to the extent" the environmental division determined that the application was complete and that VTrans's rights vested on October 6, 2014, Vallee's arguments regarding chloride management were irrelevant and must be dismissed. This is at most an acknowledgement of Vallee's position and not a concession that there exists a genuine issue of material fact on this point.

key logical assumption was improperly drawn against the nonmoving party at the summary judgment stage.

¶ 23.    Third, noting a screenshot of ANR records indicating that the application had been completed on October 6, 2014, as well as an ANR employee's affidavit stating that he had determined that the application was deemed complete on October 6, 2014 based on his review of the application materials and ensuing correspondence, the court stated: "If we give weight to any of these items, it would be to the analyst's offer that the application was deemed complete on October 6, 2014."   Vallee contends that this comment constituted an improper weighing of evidence on summary judgment.

¶ 24.    We find these arguments unpersuasive.   The environmental division simply recognized that the ANR employee: (1) acknowledged in an October 3, 2014 email that she had received VTrans's application on that day and would be reviewing the application at her earliest convenience[7]; and (2) stated in an October 16, 2014 email that she had begun her technical review of the application, which, pursuant to ANR policy and practices, did not commence until the application was administratively complete.   We discern no improper inferences drawn from the court's reasoning as to the import of the emails.   Nor did the court improperly weigh evidence. Vallee has not pointed to any documentation or affidavits it submitted to raise a reasonable doubt as to when the application was deemed administratively complete.   Vallee cannot rely on mere allegations to rebut credible documentary evidence of when the application was deemed administratively complete.   In short, there is no genuine dispute as to the timeline of review of the application.

---

[7]   ANR's permit application review procedure states that a review for "administrative completeness is usually conducted upon receipt of an application package" and "should be completed within 15 days of application receipt."

¶ 25. Vallee contends, however, that even if the October 2014 application was complete, it was superseded by VTrans's January 2015 application. The environmental division rejected this argument, ruling that VTrans's revised January 2015 application merely supplied additional information requested following ANR's technical review. Vallee contends on appeal that the January 2015 application was an entirely new application with a new cover sheet and more than mere piecemeal edits of the original application. We disagree that the revised application created a new vesting date.

¶ 26. After initiating its technical review in October 2014, ANR requested several revisions and supplemental information—a normal process entirely consistent with ANR policies and procedures. See Hannaford Bros., No. WQ-01-01, slip op. at 11 (stating that "agencies reviewing complex permit applications commonly ask for supplemental information," which is why applications are deemed administratively complete for vesting purposes when they "reasonably address all the factors that the agency is legally required to address in its permit review"). In response, VTrans modified some stormwater structures and included a list of owners of impervious surfaces associated with the project. For purposes of determining vesting rights, these changes did not constitute a new application that superseded the October 2014 application for the project. This is not a situation where the applicant submitted "a request for a permit based on partial and insufficient information" that prevented any review of the application. See In re Ross, 151 Vt. 54, 59, 557 A.2d 490, 493 (1989) (concluding that Act 250 permit applicant did not have vested right in law at time of initial application on two criteria after commission deferred ruling on those criteria due to inadequate application submitted to protect against proposed town plan amendment that would set density limits on developments); see also In re Champlain Oil Co., 2004 VT 44, ¶¶ 11, 17, 176 Vt. 458, 852 A.2d 622 (concluding that applicant's "sketch-plan application could not vest a right to consideration under the then-existing zoning laws for subsequent final site plan approval or a zoning permit application"); In re Taft Corners Assocs.,

11

171 Vt. 135, 142, 758 A.2d 804, 810 (2000) (concluding that zoning permit application did not vest right in zoning regulation enacted after landowner applied for subdivision permit but before he applied for zoning permit).

¶ 27.   Permit applications are often complex, and they routinely require revisions and supplemental information before being finalized.  Negating vesting rights based on such changes and attempting to divine a completeness date would undermine our vesting law, which we adopted "because we found it more practical to administer, it provided greater certainty, and it avoided extended litigation."  B & M Realty, 2016 VT 114, ¶ 22.

¶ 28.   Vallee argues, however, that the vesting rule we adopted in Smith should not apply to stormwater permit applications.  Noting that this Court has never adopted this vesting rule in the context of stormwater applications, Vallee argues that doing so would be inconsistent with the federal Clean Water Act, pursuant to which Vermont's Water Quality Standards are adopted.  Vallee contends that the policy reasons for adopting the Smith vesting rule are not relevant with respect to stormwater applications because water quality standards are not subject to retributive changes in the law aimed at blocking projects and because environmental considerations must trump a landowner's reasonable expectations.  The State disputes these policy arguments and points out that the stormwater permit at issue here was granted pursuant to a state permit program.

¶ 29.   As we have stated, "[o]ur adoption of the minority rule—vesting rights under existing regulations and laws as of the time when the proper application is filed—was not without careful thought and analysis."  In re Times & Seasons, LLC, 2011 VT 76, ¶¶ 13-14, 190 Vt. 163, 27 A.3d 323 (citing "practicality of administration, avoidance of extended litigation and maneuvering, and certainty in the law and its administration," and further noting policy of 1 V.S.A. § 213, which provides that nonprocedural enactments shall not affect pending suits).  In any event, we decline to consider Vallee's challenge to the Smith vesting rule because it is raised for the first time in this appeal.  In its opposition to ANR's and VTrans's partial motions for summary

12

judgment, Vallee cited Smith as general authority for when a permit application is complete and did not argue that the Smith vesting rule should not control the vesting date for stormwater applications. Further, in seeking reconsideration of the environmental division's October 2017 summary judgment ruling, Vallee argued that the court failed to consider the "pending ordinance doctrine" as an exception to the Smith vesting rule—an argument that it does not raise here on appeal—but it did not otherwise suggest that the rule is inapplicable with respect to stormwater permit applications, as it does here. "Failure to raise a reason why summary judgment should not be granted at the trial precludes raising it on appeal." Lane v. Town of Grafton, 166 Vt. 148, 153, 689 A.2d 455, 457 (1997). In short, Vallee has not presented any basis for us to disturb the environmental division's decision to grant VTrans a stormwater permit for the proposed project.

## II. The Act 250 Permit

### A. Criterion 5(B)

¶ 30. Before addressing Vallee's contention that the environmental division erred by dismissing Vallee's Act 250 questions claiming undue pollution from chloride and phosphorus, we consider, and reject, Vallee's argument that the court erred in excluding consideration of Criterion 5(B) based on its determination of when VTrans's Act 250 application vested.

¶ 31. The parties disputed whether Vallee's Act 250 application vested before or after the addition of Criterion 5(B), which requires projects, as appropriate, to "incorporate transportation demand management strategies and provide safe access and connections to adjacent lands and facilities and to existing and planned pedestrian, bicycle, and transit networks and services." 10 V.S.A. § 6086(a)(5)(B).[8] In its June 1, 2018 merits decision, the environmental division addressed that dispute, ruling that the revisions VTrans made to its initial November 2013

_____

[8] Enacted pursuant to 2013, No. 147 (Adj. Sess.), § 2, with effective date of June 1, 2014. The 2014 amendment created Criteria 5(A) and 5(B) from the former Criterion 5, but 5(A) is not at issue in this case.

Act 250 permit application were not substantial enough to establish a new vesting date for determining what laws applied to the application.[9]  We agree.

¶ 32.  Vallee does not challenge the environmental division's findings regarding the timeline for VTrans's Act 250 application, which reveal the following facts.  VTrans initially submitted its Act 250 application in November 2013.  VTrans had assumed the projected 9.82 acres of involved land would not trigger Act 250's jurisdictional threshold, and therefore the agency sought only to amend its existing Act 250 permits that would be affected by the project.  By March 2014, VTrans determined that revisions to the project, including to the stormwater system, would cause the project to exceed the ten-acre threshold.  In April 2014, VTrans submitted new materials to supplement its November 2013 application, explaining that the project would remain basically the same as originally proposed but would now exceed the ten-acre threshold.  On June 4, 2014, VTrans submitted a revised Schedule E to the application updating its list of abutting landowners.

¶ 33.  Vallee argues that the changes in the application from November 2013 to June 2014 were substantial enough to extinguish any vesting rights until June 4, 2014, after Criterion 5(B) was enacted.[10]  We disagree.  As the environmental division found, nothing in the record suggests

_____

[9]  The environmental division also ruled that even if rights vested anew with revisions putting the project over ten acres, those revisions were presented to the district coordinator in April 2014 before the June 1, 2014 amendment splitting Criterion 5 into two parts, and that, in any event, the connectivity issue Vallee raised with respect to Criterion 5(B) was considered by the court in its analysis of Criterion 5.  Vallee does not address the former point at all on appeal, and only addresses the latter point in its reply brief in response to the State's argument that any error on the part of the environmental division was harmless.

[10]  Vallee also briefly makes two related arguments.  Vallee asserts that there is an inconsistency between the environmental division's reliance on a November 2013 vesting date for Criterion 5 and its reliance on the 2014 Colchester town plan in considering Criterion 10.  The court considered the 2014 town plan based on its finding that it was undisputed that the 2014 plan applied to the project.  Vallee has waived consideration of that argument here, given it did not dispute application of the 2014 town plan in the court's October 2017 decision, including in its motion to reconsider that decision, and it did not raise the alleged inconsistency in its post-hearing memorandum in which it argued that November 2013 should not be the vesting date for Criterion

14

that VTrans's Act 250 application was incomplete in the sense that it failed to address all applicable Act 250 criteria. See Ross, 151 Vt. at 57-58, 557 A.2d at 492-93 (holding that Smith vesting rule requires filing of complete application addressing all relevant criteria). Nor is there any suggestion of bad faith on VTrans's part with respect to the revisions it made to its application. See id. (disallowing vested rights in situation where "the orderly processes of town government [would be] frustrated when a landowner [could] easily avoid regulatory requirements by submitting a request for a permit based on partial and insufficient information"). VTrans's revisions to its application—including amending its Schedule E to add abutting landowners and seeking a separate permit instead of an amended permit for the project area because the revisions tipped the acreage over ten acres—did not fundamentally or substantially alter the project so as to cause VTrans to forfeit its vested right to the laws in place at the time it submitted its original application. The record supports the environmental division's finding that "the Project remained basically the same as initially proposed," with its nature, scope, and location remaining essentially the same.[11]

---

5. See Ball v. Barre Elec. Supply Co., 146 Vt. 245, 246, 499 A.2d 786, 787 (1985) (per curiam) (stating that issue was not preserved for appeal where no objection was made that gave trial court opportunity to consider and correct any error). Vallee also briefly argues that VTrans indicated in September 2014 that it had no objection to the application of Criterion 5(B). Any such acquiescence on the part of the State, however, did not preclude the environmental division from making a legal ruling on the appropriate vesting date of VTrans's application. See In re Handy, 171 Vt. 336, 351, 764 A.2d 1226, 1239 (2000) (issues surrounding vesting date are legal issues to be decided by "rule of law" rather than through "broad grant of discretion").

[11] The cases that Vallee relies on in support of its argument that VTrans's revisions created a new vesting date are easily distinguishable. In Taft Corners, we concluded that filing a subdivision permit application did not establish vested rights in then-current laws with respect to a subsequent zoning permit application. 171 Vt. at 142, 758 A.2d at 810. In Champlain Oil, we concluded that no rights to existing law vested under a preliminary sketch plan application for a zoning permit. 2004 VT 44, ¶ 17. Finally, in In re Application of Lathrop Ltd. Partnership I, we considered a different issue—"whether the environmental court was required to remand the Act 250 application to the district commission to consider project changes," including a changed access point to the project. 2015 VT 49, ¶ 99, 199 Vt. 19, 121 A.3d 630. To the extent that Lathrop is relevant to the issue presented here, it is distinguishable in that the changes to the Act 250 permit application—including construction of a completely new access point in a new location—could involve Act 250 criteria not relevant to the original application. Id. ¶¶ 106-107. None of these

15

## B.  Criterion 1

¶ 34.  Vallee argues that the environmental division also erred in its February 2018 decision by dismissing Vallee's two questions under Criterion 1, which alleged, respectively, that chloride and phosphorus discharges from the project would cause undue pollution to Sunnyside Brook and Lake Champlain.  According to Vallee, in dismissing those questions, the court improperly conflated Criterion 1 with Subcriterion 1(B), which provides that a permit shall be granted if it complies with state regulations regarding the disposal of wastes.  10 V.S.A. § 6086(a)(1)(B).  Vallee asserts that Criterion 1 operates independently of its various subcriteria to prevent undue pollution even if the applicant has satisfied state regulations concerning the subcriteria.  The State responds that these arguments are unavailing because Vallee has no standing under Criterion 1 or Subcriteria 1(B) or 1(E), the court properly applied Subcriterion 1(B), and there is alternative evidence to support a finding of no undue water pollution.

¶ 35.  Before addressing these arguments and counterarguments, we detail the procedural history and rulings that form the basis for Vallee's claim of error and the State's responses.  In its decision, the District Commission denied Vallee party status—the equivalent of standing—under Criterion 1 and its subcriteria.  Vallee appealed that decision to the environmental division and requested party status under Criteria 1, 1(B), and 1(E).  Criterion 1 conditions the grant of an Act 250 permit on a development not resulting "in undue water or air pollution" and sets forth several factors for consideration, one of which is "applicable Health and Environmental Conservation Department regulations."  10 V.S.A. § 6086(a)(1).  Criterion 1 also has seven subcriteria.  Id. § 6086(a)(1)(A)-(G).  Subcriterion 1(B) concerns waste disposal and provides that a permit "will be granted" when the applicant demonstrates "that, in addition to other applicable criteria, the development . . . will meet any applicable Health and Environmental Conservation Department

---

cases give us pause in concluding that VTrans's application vested in November 2013 when it was originally filed.

16

regulations regarding the disposal of wastes and will not" inject waste materials or toxic substances into groundwater. Id. § 6086(a)(1)(B). Subcriterion 1(E) concerns streams and provides that a permit "will be granted" when the applicant demonstrates "that, in addition to all other applicable criteria, the development will, whenever feasible, maintain the natural condition of [an adjacent] stream, and will not endanger the health, safety, or welfare of the public or of adjoining landowners." Id. § 6086(a)(1)(E).

¶ 36.    In a March 17, 2017 order, in response to Vallee's prehearing request for party status under Criterion 1 and Subcriteria 1(B) and 1(E), the environmental division denied Vallee party status as a landowner, see 10 V.S.A. § 6085(c)(1)(B), but granted Vallee party status as an "adjoining property owner or other person who has a particularized interest" that is protected by Act 250 and that "may be affected" by a decision under that law, id. § 6085(c)(1)(E). In concluding that Vallee had party status under the latter provision, the court determined, with respect to Criterion 1, that Vallee had made a sufficient showing that stormwater would carry pollutants onto its property. The court stated that Vallee's assertions regarding stormwater were "sufficient to establish a reasonable possibility that Vallee's particularized interest in keeping its property free from pollution may be adversely affected by water pollution from the [Diverging Diamond] project." Regarding Subcriterion 1(B), the court determined that Vallee "demonstrated a reasonable possibility that the [Diverging Diamond] project was not designed in compliance with stormwater regulations, and that wastewater in the form of stormwater runoff may enter its property and affect its interest in keeping the property free from pollution."

¶ 37.    In December 2017, VTrans, joined by ANR, moved to dismiss several of Vallee's Act 250 questions, including its questions asking whether the project would cause undue water pollution due to an increase in chloride discharges into Sunnyside Brook and phosphorus discharges into Lake Champlain. In asking the environmental division to dismiss these questions, VTrans argued that the impacts Vallee was alleging from chloride and phosphorus were from

17

stormwater runoff, which is addressed in Act 250 under Subcriterion 1(B) concerning the disposal of wastewater and waste material.[12] Citing the environmental division's October 2017 decision not to allow Vallee to challenge the stormwater permit based on the presence of chloride and phosphorus, VTrans argued that stormwater should be reviewed consistently in both permit appeals, and that reviewing chloride and phosphorus separately from stormwater runoff would run counter to managing stormwater runoff without independently reviewing its constituent pollutants. In VTrans's view, because chloride and phosphorus were contained entirely in stormwater runoff, which is governed by Subcriterion 1(B), and because under the law of this case there were no applicable water quality standards for those elements, there was no basis to review those chemicals pursuant to Criterion 1 to determine whether their presence resulted in undue pollution.

¶ 38. In opposing the dismissal of these questions, Vallee argued that Criterion 1 and Subcriterion 1(B) are independently operating provisions and that the purpose of Criterion 1 is to assess water pollution issues apart from the stormwater permitting process. Vallee contended that because the applicable regulations considered under Subcriterion 1(B) did not protect water quality with respect to pollution from chloride, it was appropriate for the environmental division to determine under Criterion 1 whether undue water pollution would result from the increase of chloride from the project. Vallee further contended that review under Criterion 1 was required to address the impervious surfaces within the project area not covered by VTrans's stormwater permit. In Vallee's view, even assuming that the more recent water quality standards dealing with chloride did not apply to its Act 250 permit application, factors set forth in Criterion 1 and Department of Environmental Conservation (DEC) regulations provided a basis to determine if chloride pollution from the project was undue. Vallee asserted that levels of chloride in Sunnyside

---

[12] VTrans argued that Vallee had not claimed chloride and phosphorus were being applied directly as chemical agents into the waterways and that, to the extent Vallee was alleging undue pollution from the "bounce and scatter" of applying road salt on impervious surfaces, then Vallee had to narrow its chloride questions to that allegation, which VTrans could address at trial.

Brook already exceeded the levels established by the Environmental Protection Agency (EPA) at which aquatic life is harmed, that the project would increase chloride levels in the stream, and that practicable measures existed to prevent this.

¶ 39.     In its February 2018 decision addressing VTrans's motion to dismiss several of Vallee's questions, the environmental division concluded that because VTrans's Act 250 permit application vested when the comprehensive regulatory scheme for stormwater runoff left chloride and phosphorus unregulated, no relief could be granted with respect to Vallee's questions addressing Criterion 1 and Subcriterion 1(B).  The court reasoned that allowing Vallee to allege excessive chloride and phosphorus in stormwater runoff in the context of the Act 250 review would negate Vermont's vested rights doctrine by permitting Vallee to replace the stormwater regulatory regime in effect at the time of VTrans's Act 250 application with a subsequently enacted or alternative regime that regulated chloride and phosphorus.  The court also opined that allowing the questions would lead to absurd results because, under Vallee's reasoning, the area of the project that did not even require a stormwater permit might be subject to more stringent controls with respect to stormwater runoff than the area that required a stormwater permit.

¶ 40.     On appeal, Vallee repeats its argument that Criterion 1 operates separately from Subcriterion 1(B) and that its purpose is to determine whether the subject project will result in undue water pollution outside the context of the stormwater permitting process.  According to Vallee, the environmental division's decision effectively makes Criterion 1 superfluous.  Vallee notes that Criterion 1, as well as the Natural Resources Board Training Manual, lists factors for determining whether water pollution is undue that are not limited to complying with environmental regulations.  See 10 V.S.A. § 6086(a)(1) (setting forth several nonexclusive factors to be considered in determining whether development will result in undue water or air pollution); NRB Training Manual, https://nrb.vermont.gov/sites/nrb/files/documents/1%28water%29final.pdf [https://perma.cc/4ZR4-HTE7].  Vallee points out that long ago this Court noted the breadth of

19

Act 250 in rejecting the position that compliance with DEC regulations prevented Act 250 review under Criterion 1. See In re Hawk Mt. Corp, 149 Vt. 179, 184, 542 A.2d 261, 264 (1988) (stating that, in considering whether there was undue water pollution pursuant to Act 250's Criterion 1, Environmental Board was not limited to considering factors listed in that provision, including compliance with health and environmental regulations).[13] Vallee also argues that the court's decision effectively prevents it from rebutting the presumption of compliance resulting from the issuance of a stormwater permit. Finally, Vallee argues that the environmental division violated this Court's limitation on the vested rights doctrine by applying a vested right concerning a stormwater permit to an Act 250 application. Cf. Tafts Corners, 171 Vt. at 139-40, 758 A.2d at 809 (concluding that applicant who obtained subdivision permit before adverse regulatory change had no vested right in separate zoning permit which applicant sought after regulatory change).

¶ 41. We conclude that Criterion 1 and Subcriterion 1(B) are independent criteria with different standards and that the environmental division erred by dismissing Vallee's Act 250 questions concerning Criterion 1 based solely on the vested rights doctrine and the fact that no chloride or phosphorus standards existed under the stormwater regulations applicable in this case.[14]

---

[13] We note that in Hawk Mountain, the Act 250 permit applicants contended that the Water Resources Board's water quality standards were not environmental regulations within the meaning of Act 250's Criterion 1. We concluded that even if the water quality standards could not be considered environmental regulations under Criterion 1, "the Environmental Board could still properly consider them when determining whether a land use permit should be granted" because "the Board is not limited to the considerations listed in Title 10." Hawk Mt. Corp., 149 Vt. at 184, 542 A.2d at 264.

[14] We find unavailing the State's argument that Vallee has no standing to challenge the dismissal of its Act 250 questions concerning Criterion 1. In its June 1, 2018 decision granting VTrans's stormwater and Act 250 permits, the environmental division concluded that Vallee could not retain party status—i.e., standing—under Subcriteria 1(B) or 1(E) because it had failed to identify during the five-day merits hearing how the project's stormwater system might impact its particularized interest. In its March 2017 decision granting Vallee standing on water quality criteria, the court had not indicated that its standing decision was preliminary in nature. Nonetheless, it denied Vallee standing on Subcriteria 1(B) and 1(E) at the close of evidence in the merits hearing by relying on provisions in Act 250 that: (1) require the District Commission to consider before the close of hearings "the extent to which parties continue to qualify for party

20

¶ 42.    In dismissing Vallee's Criterion 1 questions, the environmental division essentially reasoned that because there were no water quality standards for chloride and phosphorus in place when Vallee's permit applications vested, Vallee was foreclosed from making any argument under Act 250's Criterion 1 that the presence of chloride and phosphorus in stormwater runoff would result in undue water pollution.  In the court's view, allowing Vallee to claim undue water pollution from chloride or phosphorus would negate our vested rights doctrine.

---

status," 10 V.S.A. § 6085(c)(6), and (2) make applicable in a de novo hearing before the environmental division "the substantive standards that were applicable before the tribunal appealed from," id. § 8504(h).  The court noted that at the close of evidence it had expressed concern regarding Vallee's continuing party status under Subcriteria 1(B) and 1(E) because Vallee had not presented any evidence during the hearing that stormwater might enter or affect its property.  The court stated that, despite having had ample opportunity during the hearing to do so, Vallee failed to show that the project's stormwater system would impact its interests or to "introduce any evidence to connect stormwater runoff from the Project in any way at all to Vallee's property." The court further noted that it had given Vallee an opportunity to submit a posttrial brief that could point to evidence demonstrating it had a particularized interest regarding those subcriteria, but Vallee failed to make such a showing.  Nevertheless, the court also concluded that it would treat Vallee as a "friend of the Court" and consider evidence it offered on these subcriteria through cross-examination and its own witnesses, in part to avoid prejudicing other parties, Timberlake and the Conservation Law Foundation, both of which shared Vallee's position and wished to rely on Vallee's evidence.  The court then rejected Vallee's sole argument under Subcriterion 1(B) that the stormwater discharge permit should not have been issued, as well as Vallee's argument that under Subcriterion 1(E) the chloride discharges from the project would impact the natural condition of Sunnyside Brook.

We conclude that the State's lack-of-standing argument is unavailing in this case because, even assuming the court could eliminate Vallee's party status following the close of evidence without giving Vallee an opportunity to present additional evidence on that issue, the court denied Vallee party status only on Subcriteria 1(B) and 1(E).  The court did not remove Vallee's party status on Criterion 1 because it had previously dismissed Vallee's questions concerning that criterion.  Moreover, we see no point in remanding the matter for the environmental division to consider Vallee's ongoing party status under Criterion 1 because: (1) Timberlake was a party to the proceedings before the environmental division with respect to all criteria based on its landowner status; (2) Timberlake, along with the Conservation Law Foundation, joined in Vallee's Criterion 1 and subcriteria questions, and the environmental division addressed the merits of Vallee's questions concerning Subcriteria 1(B) and 1(E) despite its removal of Vallee's party status on those subcriteria because, in addition to considering Vallee a "friend of the Court," it did not want to prejudice Timberlake; and (3) Timberlake has joined Vallee's arguments in this appeal. Thus, we must address whether the environmental division improperly dismissed Vallee's questions under Criterion 1.

¶ 43.    The law does not support this reasoning.  Criterion 1 and its subcriteria, including Subcriteria 1(B), are closely related, but they are not the same; rather, they involve distinct factors and standards.  If all other applicable criteria have been met, an Act 250 permit will be granted pursuant to Subcriterion 1(B), in relevant part, whenever the applicant demonstrates that the proposed project "will meet any applicable Health and Environmental Conservation Department regulations regarding the disposal of wastes."  10 V.S.A. § 6086(a)(1)(B).  Under Act 250, Rule 19, a stormwater permit creates a rebuttable presumption that the subject project meets relevant Act 250 criteria, including Criterion 1.  In re Woodstock Cmty. T. & Hous. Vt. PRD, 2012 VT 87, ¶ 26, 192 Vt. 474, 60 A.3d 686; see 10 V.S.A. § 6086(d) (providing for promulgation of rules whereby acceptance of "permits shall create a presumption that the application is not detrimental to the public health and welfare with respect to the specific requirement for which it is accepted"). "The presumption disappears when credible evidence is introduced fairly and reasonably indicating that the real fact is not as presumed."  Hawk Mt. Corp., 149 Vt. at 186, 542 A.2d at 265. Notably, in legislative proceedings concerning a 2004 amendment to § 6086, the Legislature ultimately rejected proposed language in the original House Bill that would have amended § 6086(d) to provide that ANR determinations in the context of permits concerning the first five criteria of Act 250 "shall be dispositive for any issue addressed in the agency permits or approvals under the relevant criteria of subsection (a)" of the Act.  H.175, 2004 Legislative Session, http://www.leg.state.vt.us/docs/legdoc.cfm?URL=/docs/2004/bills/house/H-175.HTM&Session= 2004 [https://perma.cc/C4RH-SDPG].  Instead, the amendment maintained § 6086(d)'s language regarding the presumption created by the existence of relevant permits.  See 2013, No. 115 (Adj. Sess.), § 56.

¶ 44.    On the other hand, for an applicant to satisfy Criterion 1, the District Commission (or environmental division on appeal) must find that the proposed project "[w]ill not result in undue water or air pollution."  10 V.S.A. § 6086(a)(1).  As frequently recognized by the

environmental division and the former Environmental Board, whether "undue" pollution will result from a proposed project is a highly fact-specific inquiry that depends on a wide variety of factors, only one of which is compliance with applicable regulations. In re N. E. Materials Grp., LLC, 2019 VT 55, ¶ 28, ___ Vt. ___, ___ A.3d ___; see, e.g., In re N. E. Materials Group Amended A250 Permit, No. 35-3-13 Vtec, 2016 WL 2839328, at *8 (Vt. Sup. Ct. Envl. Div. April 18, 2016), http://www.vermontjudiciary.org/sites/default/files/documents/N.E.%20Materials%20Grp%2035 -3-13%20Vtec%20Merits%20Altered.pdf [https://perma.cc/2PJ9-9XGZ] (stating that there is no clear definition of what constitutes undue pollution, and that determination of whether project creates undue pollution is highly fact-specific inquiry); In re John J. Flynn Estate, No. 831, 2004 WL 1038110, slip op. at 11 (Vt. Envl. Bd. May 4, 2004), https://nrb.vermont.gov/sites/nrb/files/ documents/4c0790-2-fco.pdf [https://perma.cc/TM4Q-PS54] (noting absence of any "clear definition of what constitutes 'undue' pollution," as demonstrated by fact-specific decisions that "are often more instructive about what is not 'undue,' than what is").

¶ 45. Nevertheless, Criterion 1 requires "at least" consideration of the following factors:

> the elevation of land above sea level; and in relation to the flood plains, the nature of soils and subsoils and their ability to adequately support waste disposal; the slope of the land and its effect on effluents; the availability of streams for disposal of effluents; and the applicable Health and Environmental Conservation Department regulations.

10 V.S.A. § 6086(a)(1). As noted, the environmental division is not limited to these factors, but may consider any factors relevant to a determination of whether a proposed project will cause undue pollution. Hawk Mt. Corp., 149 Vt. at 184, 542 A.2d at 264; see NRB Training Manual, supra (stating that whether pollution is undue pursuant to Criterion 1 depends on factors "such as the nature and amount of pollution, character of the surrounding area, whether the activity complies with environmental regulations or recommended levels, whether the pollutant will cause adverse health effects, and whether effective measures will be taken to reduce the pollution").

¶ 46. Dismissing Vallee's questions concerning Criterion 1 based on the fact that water quality standards for chlorine and phosphorus did not exist at the time of Vallee's permit applications effectively negates Criterion 1's general independent inquiry as to whether a project will create undue water pollution, even though compliance with applicable regulations is only one factor for consideration under that criterion. Further, obtaining a stormwater permit creates only a rebuttable presumption that Criterion 1 is satisfied. For these reasons, the environmental division erred in dismissing the questions.

¶ 47. Moreover, the record does not support the State's argument that the environmental division acted within its discretion in dismissing Vallee's Criterion 1 questions because Vallee's only argument from the beginning of these proceedings was that the later 2014 water quality standards that included chlorine and phosphorus standards should apply to VTrans's proposed project. To be sure, Vallee has consistently argued both before the environmental division and here on appeal that the later water quality standards should apply. But, as noted above, Vallee also argued that Criterion 1 and Subcriterion 1(B) are independently operating provisions and that, even if the later water quality standards did not apply, undue water pollution would result from chloride and phosphorus discharges from the project. In making the latter argument, Vallee alleged that the project would increase the chloride levels in Sunnyside Brook, which already allegedly exceeded federally established levels concerning harm to aquatic life, and that mitigation measures could be put in place to reduce the pollution.

¶ 48. Finally, we reject the State's alternative argument that, even assuming the environmental division should have reviewed the chloride and phosphorus discharges separately under Criterion 1, this Court can still affirm the environmental division's decision because the record supports the conclusion that the proposed project complies with Criterion 1. We recognize that Vallee has the burden of demonstrating that the proposed project does not satisfy Criterion 1. See 10 V.S.A. § 6088(a). We also recognize that the District #4 Environmental Commission in

24

this case rejected Vallee's arguments under Criterion 1, concluding that Vallee had failed to demonstrate that any increase in chloride or phosphorus resulting from the project was significant in either amount or impact. Further, the District Commission was unpersuaded that any additional reasonable chloride mitigation treatment could be implemented. Nevertheless, the environmental division's review of the Act 250 permit application is de novo, see id. §§ 6089, 8504(h), and the environmental division's dismissal of Vallee's Criterion 1 questions prevented Vallee from presenting any evidence on whether chloride or phosphorus discharges from the proposed project would result in undue pollution. Accordingly, the matter must be remanded for the environmental division to address the merits of those questions.

The environmental division's issuance of the stormwater permit is affirmed. The environmental division's issuance of the Act 250 permit is reversed, and the matter is remanded for the environmental division to consider appellant's amended questions 1.a. and 1.b. concerning Criterion 1 of Act 250.

FOR THE COURT:

Associate Justice